**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DANIEL OKOE, *individually and on*
*behalf of all others similarly situated,*

           Plaintiff,

           v.

HEADCLICKS, INC.

           Defendant.

---

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

---

Plaintiff OKOE (herein "Plaintiff OKOE" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint against Defendant, HEADCLICKS, INC. ("Defendant" or "HEADCLICKS") and alleges the following upon his own knowledge, or where he lacks personal knowledge, upon information and belief, including the investigation of his counsel:

## NATURE OF THE ACTION

1.      This lawsuit involves the advertising, marketing, and sale of Himalayan crystal salt lamps by Defendant, which represented the Products as capable of (1) trapping positive ions and

releasing negative ones, (2) cleansing and de-odorizing the air, (3) capturing dust, pollen, cigarette smoke, and other containments form the air, (4) easing coughing, (5) alleviating allergies and asthma symptoms, (6) neutralizing the harmful effects of electromagnetic radiation, and (7) promoting better sleep, mood, and concentration.

2.      Defendant's salt lamps do not have these capabilities, however.  By making false, deceptive and misleading statements to consumers, Defendant has deceived thousands of consumers into spending significant sums on its salt lamps products, which do not deliver their advertised benefits.

3.      Plaintiff OKOE was exposed to Defendant's deceptive misrepresentations when he purchased Defendant's Amethya Natural Himalayan Salt Lamp Hand Carved (Set of 2) through Amazon.com.  Below is an image of the product as it appears on Defendant's website (see Exhibit A).



4.      Plaintiff brings this proposed consumer class action individually and on behalf of all other persons similarly situated, who, from the applicable limitations period up to and including the present ("Class Period"), purchased any of the following Amethya brand salt lamps for personal use and not for resale, named as follows on the Defendant's website:

        a.  Amethya Natural Himalayan Salt Lamp Hand Carved (Set of 2)
        b.  Himalayan Crystal Salt Mini Lamp
        c.  Natural Himalayan Salt Lamp Hand Carved With Elegant Wood Base
        d.  Amethya Himalayan Salt Lamp Fire Bowl
        e.  Himalayan Metal Basket Bowl Salt Lamp
        (individually, a "Product"; collectively, "the Products")

*See* **Exhibit A** and **B.**

5.      Plaintiff and the Class were injured, deprived of the benefit of their bargains, because the value of the Products as warranted by Defendant is substantially less than the Products as they actually function.

6.      Plaintiff seeks to secure, among other things, equitable and declaratory relief, restitution, and alternative damages, for similarly situated United States purchasers, against Defendant, for (1) deceptive acts or practices in violation of New York's Deceptive Acts or Practices Law, Gen. Bus. Law § 349; (2) false advertising in violation of New York's Deceptive Acts or Practices Law, Gen. Bus. Law § 350 (3) Breach of Express Warranty; (4) Common Law Fraud.

7.      In addition to damages, Plaintiff is seeking an Order requiring Defendant to cease marketing and advertising the Products with misleading statements about their non-existent health benefits.

8.      Plaintiff expressly does not seek to contest or enforce any state law that has requirements beyond those required by federal laws or regulations.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

10.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant, pursuant to New York Statute N.Y. CVP. Law § 302, because Defendant conducts substantial business in this District, some of the actions giving rise to the Complaint took place in this District, and some of Plaintiff's claims arise out of Defendant operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; committing a tortious act in this state; and causing injury to person or property in this state arising out of Defendant's acts and omissions outside this state. Additionally, this court has personal jurisdiction over Defendant because its Product is advertised, marketed, distributed, and sold throughout New York State; Defendant engaged in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; and Defendant has sufficient minimum contacts with New York and/or otherwise have intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendant is engaged in substantial and not isolated activity within New York State.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendant

has caused harm to class members residing in this District, and the Defendant is resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

## PARTIES

*Plaintiff*

12.        Plaintiff OKOE is, and at all times relevant hereto has been, a citizen of the State of New York and a resident of New York County. On April 16, 2018, Plaintiff purchased one of the Products—Amethya Natural Himalayan Salt Lamp Hand Carved (Set of 2)—through Amazon.com for the premium price of $25.00. Below is an image of the Product:



*See* **Exhibit C.**

13.     Plaintiff did so in reliance on Defendant's false and deceptive health claims as detailed below, which he viewed both on Amazon.com and on Defendant's website. Plaintiff did not know, and had no reason to know, that these health claims were false and deceptive. Plaintiff would not have purchased the Product had he known that they were false and deceptive. Plaintiff suffered injury-in-fact as the result of Defendant's misrepresentations because the Product as it actually functions has less value than the Product as warranted by Defendant.

*Defendant*

14.     Defendant HEADCLICKS, INC. is a business operating at 390 Fairfield Ave, Stamford, CT 06902 and incorporated under the laws of Delaware. Its registered agent is National Registered Agents, Inc. and its address for service of process is 160 Greentree Dr. Ste 101, Dover, DE 19904.

15.     Defendant develops, markets and sells its line of salt-based lamp products under the brand name Amethya throughout the United States.

16.     Defendant owns, manufactures and distributes the Products, and created and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling and advertising for the Products at issue. The Product advertisements and descriptions, relied upon by Plaintiff and the Class, were prepared and/or approved by Defendant and its agents, and contained false representations prepared and/or approved by Defendant and its agents. These advertisements were disseminated by Defendant and its agents with misrepresentations alleged herein.

## FACTUAL ALLEGATIONS

### Salt Lamps

17.      Salt lamps are constructed from large pinkish rock crystals that are mined in the

foothills of the Himalayas, in Pakistan. The salt crystals of then carved into "lamps" of varying

shapes and sizes. Once a light bulb is inserted inside, they emit a pinkish light.

### Defendant's Deceptive Misrepresentations

18.      Defendant makes the following claims on Defendant's website in its Product

descriptions:

> Made And Hand Carved In Pakistan With Natural Himalayan Crystal Salt On Neem Wood Base
>
> Once Lit, The Heated Salt Trapps [sic] Positive Ions And Releases Negative Ions Cleaning And Deodorizing The Ambient Through Hygroscopy
>
> Recommended To Reduce Dust, Pollen, Cigarette Smoke, Among Other Elements From The Air. Ideal To Alleviate Allergy And Asthma Symptoms...
>
> Salt lamps cleanse & deodorize the air: incredible power to remove dust, pollen, cigarette smoke, and other contaminants from the air.
>
> Himalayan salt lamps purify air through the power of Hygroscopy, meaning that they attract water molecules from the surrounding environment then absorb those molecules − as well as any foreign particles they may be carrying − into the salt crystal. As the hps [sic] lamp warms up from the heat produced by the light bulb inside, that same water then evaporates back into the air and the trapped particles of dust, pollen, smoke, etc. remain locked in the salt.
>
> Reduce allergy & asthma symptoms: because Himalayan salt lamps remove microscopic particles of dust, pet dander, mold, mildew and the like from the surrounding air, placing a lamp or two in the rooms where you spend the most time can seriously cut back on allergy symptoms. Even people who suffer from asthma should notice a big difference after a week or two.
>
> Eases coughing: when the Himalayan salt lamp heats up and begins its hygroscopic cycling of airborne particles, it also changes the charge of the molecules which are released.
>
> Neutralize electromagnetic radiation: as they emit negative ions into the air,

Himalayan salt lamps work to neutralize electromagnetic radiation. Keep one next to the computer, television, and any other electrical devices which you use frequently to reduce the potential danger to you and your family.

Better sleep: positively-charged particles can actually reduce blood and oxygen supply to the brain resulting in irregular sleep patterns. Himalayan pink salt lamps are natural negative ion generators; thus they can help to reverse this problem.

Other important benefits: improve mood and concentration, reduce static electricity in the air, environmentally-friendly light source.[1]

*See* **Exhibit A.**

19.     Similar representations are repeated on Defendant's website for all subsequent other Products listed in ¶ 4, i.e. Himalayan Crystal Salt Mini Lamp, Natural Himalayan Salt Lamp Hand Carved With Elegant Wood Base, Amethya Himalayan Salt Lamp Fire Bowl, and Himalayan Metal Basket Bowl Salt Lamp. See **Exhibit B**.

20.     Similar representations are repeated elsewhere wherever Defendant's salt lamps are sold. For example, Defendant's Product description on Amazon.com states in relevant part:

- Once Lit, The Heated Salt Traps Positive Ions And Releases Negative Ions, Cleaning And Deodorizing The Ambient Through Hygroscopy
- Recommended To Reduce Dust, Pollen, Cigarette Smoke, And Other Unpleasant Elements From The Air. Ideal To Alleviate Allergy And Asthma SymptomsMade with real natural Himalayan Crystal salt, its pinkish looks will turn bright orange when lighting it up at night, while helping to purify the air from many different particles[2]

21.     Similar representations are repeated on Amazon.com for all subsequent other Products listed in ¶ 4, i.e. Himalayan Crystal Salt Mini Lamp, Natural Himalayan Salt Lamp Hand Carved With Elegant Wood Base, and Himalayan Metal Basket Bowl Salt Lamp.[3] See **Exhibit E**.

---

[1]     https://amethya.com/collections/lamps/products/set-of-2-natural-himalayan-salt-lamp-hand-carved-with-elegant-wood-base-includes-bulbs-5-7-inches-5-7-lbs-each (last viewed 11.12.18)

[2] https://www.amazon.com/Natural-Himalayan-Lamp-Carved-Elegant/dp/B01MDU55WR?ref=ast_p_ei (last viewed 11.12.18)

[3] Amethya Himalayan Salt Lamp Fire Bowl is not listed in Amazon at the date of 11.12.18)

**The Scientific Truth About Salt Lamps**

22.      All of Defendant's representations are false and misleading, however.  They are
premised on the idea that the Products emit negative ions, the supposed source of their claimed
therapeutic powers.  The website *What Is* explains the nature of ions, which are a common
feature of most environments:

> An ion is an atom or group of atoms in which the number of electrons is
> different from the number of protons. If the number of electrons is less than
> the number of protons, the particle is a positive ion, also called a cation. If
> the number of electrons is greater than the number of protons, the particle
> is a negative ion, also called an anion.
>
> When an atom of an element is short an electron, a plus sign is placed after
> its chemical symbol as a superscript to indicate that fact. For example, a
> carbon atom with 5 electrons (the nucleus has 6 protons) is symbolized $C^+$.
> If the element is short 2 or more electrons, a numeral is also placed in the
> superscript, directly before the plus sign, to indicate the extent of the
> electron deficiency. A carbon atom with 4 electrons is therefore symbolized
> $C^{2+}$, and a carbon atom with 3 electrons is symbolized $C^{3+}$.[4]

23.      Thus, salt is an ionic compound because a salt molecule—Sodium Chloride or
NaCl—is comprised of a positively charged sodium ion and a negatively charged chlorine ion.

24.      The notion that salt lamps can emit negative ions presupposes that the heat
generated by the light bulb inside can break apart salt molecules in order to send negative chloride
ions into the surrounding environment, where they will allegedly work their magic.  However, this
runs contrary to established scientific knowledge.  Science journalist Signe Dean explains:

> The usual narrative about these lamps seems to be that heating up a chunk
> of salt releases ions. However, that simply isn't possible. To break apart the
> ionic bond between the two chemicals comprising salt, you'd need a far
> greater energy input than a tiny light bulb can provide. Besides, if that did
> happen, the salt would emit chlorine gas, and you'd definitely notice that.[5]

---

[4] http://whatis.techtarget.com/definition/ion
[5] http://nevertoocurious.com/2015/06/11/salt-lamps-are-pseudoscience/

25.    These points will be confirmed by any scientific professional with a basic understanding of salt's chemical properties.  Below is a representative sample:

> We have a lot of experience with observing ions. What we did with the lamp, since it's supposed to make negative ions, was to place it adjacent to the inlet and, just by itself, we observed no ions at all. We turned it on and looked for negative ions. We looked for positive ions. We waited for the lamp to heat up. The bulb inside eventually does heat the rock salt, but we didn't see anything.
>
> I can't think of any physical process that would result in the formation of Ions from heating rock salt, with and without the presence of water vapor in any amount. Rock salt has a face-centered cubic structure which would not be expected give rise to electric fields that would generate ions around individual crystals.
>
> -    Jack Beauchamp, professor of chemistry at the California Institute of Technology[6]
>
> The only way to get those ions or salts into the atmosphere is using very high energy radiation like using something like x-ray and focused x-rays and we don't have them in our house or do we want it.  The same x-ray you want to examine a broken bone or radiate a tumor.  That is the kind of energy it would take to get those salts into the air. We do not want to be exposed to these amounts of x-ray without those amounts of health benefits. And those types of radiation do not exist in our house.
>
> -    Dr. May Nyman, PhD, of the American Chemical Society and Professor of Chemistry at Oregon State.[7]
>
> That is not happening in a Himalayan salt lamp where you have a flame, incandescent bulb or led bulb.  You are not heating up the salt high enough to liberate any of the ions from it.  The strength of [sic] between positive and negative ions of salt is very strong and therefore, they want to stay together - they don't want to scoot off into the atmosphere. A block of salt is not going to liberate any sodium or chloride ions.
>
> -    Dr. John Newsam, Ph.D., of the American Chemical Society and CEO of Tioga Research in San Diego, California.[8]

---

[6] https://www.snopes.com/salt-lamps-cure-everything/

[7] http://www.krem.com/news/salt-lamps-dont-actually-make-you-healthy-but-they-do-look-nice/501577955

[8] http://www.krem.com/news/salt-lamps-dont-actually-make-you-healthy-but-they-do-look-nice/501577955

26.     The Negative Ions Information Center tested a salt lamp and found that it was nowhere near capable of delivering the number of negative ions that would be required to have any effect on the surrounding environment:

> Having personally tested a popular brand of rock salt crystal lamp in our lab, we can attest that it was all but worthless as a generator of high-density negative ions.
>
> After measuring the negative ion output level from the salt lamp, we took our sensitive negative ion detector outdoors and measured a far higher level of naturally occurring negative ions than the salt lamp emitted.
>
> If the salt lamp's negative ion output would have been any lower, we could not have measured it. The salt lamp put out such a small level of negative ions that just taking a reading depleted the few negative ions that it did put out, and then the ion detector stopped indicating. We then had to remove the ion detector from near the salt lamp for a few minutes before we could again measure negative ions near the lamp. We couldn't tell the exact level of ions.[9]

27.     Thus, not only is there no evidence that salt lamps produce their advertised health benefits, the notion that salt lamps could emit ions in sufficient quantities to have any impact on the surrounding environment runs against established science and basic chemistry. Even absent knowledge of basic chemistry, ordinary observation alone can reveal that salt lamps are not emitting significant quantities of ions. As the anti-pseudoscience website *Science Badger* observes, "[t]he lamps are never reduced in size despite the statement that they're releasing ions constantly."[10]

---

[9] http://www.negativeionsinformation.org/saltcrystallamps.html
[10] http://www.sciencebadger.com/do-himalayan-salt-lamps-work/

28.     Even if one disregards established science and assumes that salt lamps can emit non-negligible quantities of ions, this still would not deliver the benefits promised by Defendant. The website *A Breath of Reason* observes:

> It is possible to separate sodium from chloride with high amounts of energy, but we're talking much more than what is put out from a mere 15 watt lamp. But let's just say that somehow this glowing chunk of halite on your night stand actually does release negative ions to combat the pollutants in the air. What would happen is your salt lamp would basically slowly shrink down to nothing but a pile of pure sodium (not good), and at the same time be emitting chlorine gas (really not good). And then there's the logical paradox that if these negative ions are floating away, leaving the positively charged ions in the lamp, the strong attraction between positive and negative would pull these negative ions right back onto the lamp, negating entirely the purpose of your salt lamp.[11]

29.     Thus, even if Defendant's salt lamp created a mechanism whereby negatively charged chlorine atoms were separated from positively charged sodium atoms (a scientific impossibility), it could not create a mechanism to overcome the subsequent attraction between the two ions in order to propel the chlorine atoms away from the lamp and into the area where they supposedly provide their benefits.

30.     Moreover, even if the negative ions were somehow directed away from the salt in which they originated, these ions would do nothing to combat dust, pollen, mold, fungus and odors, as Defendant's misleading representations suggest is possible. *A Breath of Reason* once again explains:

> [I]f the negative ions did bind to dust particles and allergens, and other pollutants that could trigger asthma symptoms, there's no chance of them being heavy enough to weigh the dust down, trap it against a grounded surface, and make it easy to just wipe away. In a brilliant post on the effectiveness of salt lamps, author D.B. Thomas asserts the weight of the chlorine molecule to be very small. "Chlorine has a relative atomic mass of 35.5. Basically, a "mole" of chlorine atoms 6.022 x $10^{23}$ atoms) [sic] would weigh 35.5 grams. Let's break that down to numbers that most people

---

[11] https://abreathofreason.com/2014/06/18/salt-lamps/

can readily understand.  $35.5g/6.022\times10^{23} = 5.887\times10^{-23}$ grams. Or, 0.00000000000000000000005887 grams." As if that would be enough to bring down a comparatively enormous dust particle.[12]

31.     Defendant also represents that the Products "neutralize electromagnetic radiation," which is a "potential danger to you and your family." The idea here is that the electromagnetic fields generated by household electronic devices attracts negatively charged ions, leaving a preponderance of (supposedly unhealthy) positively charged ions in the air. However, the electromagnetic fields generated by household electronics are utterly insufficient to have this effect. The World Health Organization explains:

> Wavelength and frequency determine another important characteristic of electromagnetic fields: Electromagnetic waves are carried by particles called quanta. Quanta of higher frequency (shorter wavelength) waves carry more energy than lower frequency (longer wavelength) fields. Some electromagnetic waves carry so much energy per quantum that they have the ability to break bonds between molecules. In the electromagnetic spectrum, gamma rays given off by radioactive materials, cosmic rays and X-rays carry this property and are called 'ionizing radiation'. Fields whose quanta are insufficient to break molecular bonds are called 'non-ionizing radiation'. Man-made sources of electromagnetic fields that form a major part of industrialized life - electricity, microwaves and radiofrequency fields – are found at the relatively long wavelength and low frequency end of the electromagnetic spectrum and their quanta are unable to break chemical bonds.[13]

32.     Defendant also represents that "[o]nce Lit, The Heated Salt Trapps [sic] Positive Ions And Releases Negative Ions Cleaning And Deodorizing The Ambient Through Hygroscopy." The definition of Hygroscopy according to Sciencedaily.com is a substance "… that readily attracts water from its surroundings, through either absorption or adsorption." References to former Chemist with the American Chemical Society through senior writer at Live Science says:

---

[12] https://abreathofreason.com/2014/06/18/salt-lamps/
[13] http://www.who.int/peh-emf/about/WhatisEMF/en/

> Some small amount of water vapor in the air might adhere to the salt's surface, and some of that water vapor might dissociate salt into sodium and chloride ions. But as soon as the water vapor dried, the two ion types would immediately recombine to form salt, so that process is unlikely to produce negative ions either...
>
> As for the idea that water vapor in the room attracts pollutants, then sticks to the surface of the lamp, that, too, makes little sense, he said. Some pollutants in the air might, by chance, stick to water vapor on the surface of the lukewarm piece of rock salt, but there's no evidence that the meager heat produced by a light bulb could produce significant amounts of pollutant filtering...
>
> "In terms of mass removal of pollutants from the air, I just don't think it can happen," Malin said. Instead, a chunk of charcoal with a fan blowing over it would likely have much better filtering properties...[14]

33.     In other worlds household electronics do not create the positive ions that salt lamps

supposedly counteract. So Defendant is selling a solution to a non-existent problem.

34.     Defendant claims that salt lamps benefit respiratory health. However, neither

negative nor positive ions have an appreciable effect on respiration. A comprehensive review of

23 studies concluded:

> Despite numerous experimental and analytical differences across studies, the literature does not clearly support a beneficial role in exposure to negative air ions and respiratory function or asthmatic symptom alleviation. Further, collectively, the human experimental studies do not indicate a significant detrimental effect of exposure to positive air ions on respiratory measures. Exposure to negative or positive air ions does not appear to play an appreciable role in respiratory function.[15]

35.     Not only does ionization have no effect on respiration, it also cannot deliver any of

the psychological benefits sometimes associated with it. A comprehensive review of 33 studies

---

[14] https://www.livescience.com/59328-himalayan-salt-lamp-faq.html

[15] Dominik D Alexander, William H Bailey, Vanessa Perez, Meghan E Mitchell, and Steave Su, *Air ions and respiratory function outcomes: a comprehensive review*, J Negat Results Biomed. 2013; 12: 14 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3848581/)

concluded that "[n]o consistent influence of positive or negative air ionization on anxiety, mood, relaxation, sleep, and personal comfort measures was observed."[16]

## Defendant's Misrepresentations Would Deceive, Be Material To, And Be Relied Upon By A Reasonable Consumer

36.        Defendant's deceptive representation are material in that a reasonable person would attach importance to the Products' health claims in deciding whether to purchase the Products. Defendant would not have emphasized these health claims if they were immaterial to consumer purchasing decisions. Obviously, a piece of salt that can purify air and benefit respiration will have more appeal than an ordinary piece of salt.

37.        Defendant's misrepresentations would deceive a reasonable consumer. Dr. Andrew Weill explains why Defendant's claims about negative ionization may seem plausible to the scientifically untrained consumer.

> The claim that the salt lamps release negative ions responsible for the purported health benefits may sound scientific, particularly if you're aware that these ions are naturally produced by waterfalls and ocean waves, for example – and may explain why we often feel good in these settings.[17]

38.        In other words, reasonable consumers entertain vague associations between ions and waterfalls and between waterfalls and human well-being, and these associations give Defendant's promises their superficial plausibility.

---

[16] V Perez, DD Alexander, WH Bailey, *Air ions and mood outcomes: a review and meta-analysis*, BMC Psychiatry. 2013 Jan 15;13:29
(https://www.ncbi.nlm.nih.gov/pubmed/23320516)
[17] https://www.drweil.com/health-wellness/balanced-living/healthy-home/are-himalayan-salt-lamps-worthwhile/

39.     A reasonable consumer lacks the knowledge of chemistry and physics to understand

why Defendant's negative ionization claims could not possibly be true.  The website *The Scientist*

recounts the following episode:

> One day in early July, a customer service representative for a company
> called Crystalite Salt received a phone call from Jennifer Lardge, a
> physicist. Lardge was curious about the science behind one of their
> products: lumps of salt, called lamps, that are meant to improve your health
> when they are heated. "I was looking at your Web site and I was just
> wondering about how salt lamps actually work," Lardge said. "Right,"
> responded the Crystalite Salt customer service representative. "Well I was
> just wondering how they release the ions?" "It's when it's warmed. The heat
> from the bulb or the candle. And it's like a reaction with the salt that then
> produces the ions." "OK, it's just I have studied science a little and I was
> thinking that the bonds that hold the salt ions together are quite strong and
> I was wondering if there was enough energy in an ordinary lamp bulb to
> release them." "Well they do get quite warm. I mean I am going by other
> scientific evidence, other scientific evidence that it works." "OK, which
> evidence is that?" "There are lots of sites that tell you about salt lamps." "Is
> there anything more concrete than a Web site?" "I haven't got anything more
> concrete -- no."[18]

40.     Unlike a trained physicist like Jennifer Lardge, a reasonable consumer does not

know that the amount of energy generated by an ordinary light bulb is utterly insufficient to break

up salt molecules into positive sodium ions and negative chlorine ions.  Since the reasonable

consumer knows that a light bulb does release some energy and that energy can affect the

molecular composition of matter, they will be inclined to accept Defendant's deceptive

misrepresentations at face value.  They will not know that the subjective warmth of a light bulb is

no measure of its power to break apart salt on a molecular level and generate negative ions.

41.     Plaintiff and the Class relied on Defendant's deceptive misrepresentations in

deciding to purchase the Product.  They did not know, and had no reason to know, that Defendant's

health claims were false.   Such reliance by consumers is also eminently reasonable, since

---

[18] https://www.the-scientist.com/?articles.view/articleNo/25534/title/Calling-all-charlatans/

companies are prohibited from engaging in deceptive acts or practices in the conduct of any business, trade or commerce under New York state law. Companies such as Defendant know that consumers rely upon labeling statements and advertised claims in making their purchasing decisions and intentionally use such claims.

42.     Defendant knew that its claims were false and misleading. In telling consumers that "[t]he beneficial effects of salt lamps have been known for decades," Defendant conveys that it is familiar with the science of salt lamps. But since the science of salt lamps actually reveals that salt lamps are incapable of delivering the benefits promised by Defendant, Defendant knew that its promises were false and deceptive.

**Plaintiff Was Injured by Defendant's Misrepresentation**

43.     Plaintiff believed that the Product would perform as promised by Defendant's marketing campaign and paid Defendant the sum he paid on the assumption that Defendant's health claims were true. Plaintiff would not have paid this sum solely for the aesthetic value of a salt lamp.

44.     Plaintiff was thus deprived of the benefit of his bargain. He was injured in the amount of the difference between the value of the Product as warranted and the value of the Product as it actually exists.

45.     Plaintiff was also injured when he paid a premium price for the Product than would otherwise have been possible. Defendant's false and deceptive health claims allowed it to charge consumers more for the Product. Common sense dictates that a salt lamp with medical capabilities will be seen as more valuable than a salt lamp without such capabilities, and will accordingly demand a higher price on the market.

## CLASS ACTION ALLEGATIONS

46.       Plaintiff seeks relief in his individual capacity and as representative of all others

who are similarly situated. Pursuant to Rule 23(a), 23(b)(2) and/or 23(b)(3) of the Federal Rules

of Civil Procedure, Plaintiff seek certification of the following class:

> The Nationwide Class
> All persons who have made retail purchases of the Products in the
> United States, as set forth herein, during the applicable limitations
> period, and/or such subclasses as the Court may deem appropriate.[19]

47.       In the alternative, Plaintiff seeks certification of the following class:

> The New York Class
> All persons who have made retail purchases of the Products in New
> York, as set forth herein, during the applicable limitations period,
> and/or such subclasses as the Court may deem appropriate.

48.       Excluded from the Classes are current and former officers and directors of

Defendant, members of the immediate families of the officers and directors of Defendant,

Defendant's legal representatives, heirs, successors, assigns, and any entity in which they have or

have had a controlling interest. Also excluded from the Classes is the judicial officer to whom this

lawsuit is assigned.

---

[19] *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp.*, No. 17-cv-00564 NC, 2017 U.S. Dist.
LEXIS 155654, at *15 (N.D. Cal. Sep. 22, 2017) ("Yet the Supreme Court did not extend its
reasoning to bar the nonresident plaintiffs' claims here, and *Bristol-Myers* is meaningfully
distinguishable based on that case concerning a mass tort action, in which each plaintiff was a
named plaintiff."); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 09-2047, 2017
U.S. Dist. LEXIS 197612, at *52-53 (E.D. La. Nov. 28, 2017) ("it is clear and beyond dispute that
Congress has constitutional authority to shape federal court's jurisdiction beyond state lines to
encompass nonresident parties" and interpreting *Bristol-Meyers* as barring nationwide class
actions where jurisdiction over defendant is specific "would require plaintiffs to file fifty separate
class actions in fifty or more separate district courts across the United States — in clear violation
of congressional efforts at efficiency in the federal courts."); *Horton v. USAA Cas. Ins. Co.*, 266
F.R.D. 360, 364 (D. Ariz. 2009) ("Objectors argue that this Court lacks jurisdiction to certify a
nationwide class. This argument is frivolous. A federal court applying Rule 23 of the Federal Rules
of Civil Procedure may certify a nationwide class if the requirements for certification are
satisfied.").

49.        Plaintiff reserves the right to revise the Class definitions based on facts learned in the course of litigating this matter.

50.        Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

51.        **Numerosity:** The Classes are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff, but it is clear that the number greatly exceeds the number that would make joinder practicable, particularly given Defendant's comprehensive nationwide distribution and sales network. Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

52.        **Commonality and Predominance:** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. All Class members were exposed to Defendant's deceptive and misleading health claims. Common questions of law or fact include:

a.        whether the Products can release negative ions in such quantities as to have any effect at all over the surroundings;

b.        whether the Products benefit respiratory health;

c.        whether the Products remove dust, pollen, mold, fungus, and odors;

d.        whether the Products combat the harmful effects of electromagnetic radiation;

e.        whether Defendant engaged in a marketing practice intended to deceive consumers;

f.          whether Defendant deprived Plaintiff and the other Class members of the benefit of the bargain because the Products as purchased had less value than the Products as warranted by Defendant;

g.          whether Defendant's deceptive misrepresentations allowed it to sell the Products at a premium price;

h.          whether Defendant must disgorge any and all profits it has made as a result of its misconduct; and

i.          whether Defendant should be barred from marketing the Products with the false and deceptive health claims alleged herein.

53.          Defendant engaged in a common course of conduct in contravention of the laws sought to be enforced by Plaintiff individually and on behalf of the Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

54.          **Typicality:** Plaintiff's claims are typical of those of other Class members because Plaintiff and the other Class members sustained damages arising out of the same wrongful conduct, as detailed herein. Plaintiff purchased Defendant's Product and sustained similar injuries arising out of Defendant's conduct in violation of the law of New York, the other 49 states, and the District of Columbia. Defendant's unlawful, unfair and fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. The injuries of the Class members were caused directly by Defendant's wrongful misconduct. The factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all Class members. Plaintiff's claims arise

from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

55.        **Adequacy:** Plaintiff will fairly and adequately represent and pursue the interests of either Class and has retained competent counsel experienced in prosecuting class actions. Plaintiff understands the nature of his claims herein, has no disqualifying conditions, and will vigorously represent the interests of either Class. Neither Plaintiff nor Plaintiff's counsel has any interests that conflict with or are antagonistic to the interests of either Class. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the Class. Plaintiff and Plaintiff's counsel have the necessary resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class members.

56.        **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

57.     **Declaratory and Injunctive Relief:** The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

58.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

59.     Defendant's conduct is generally applicable to the Class as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendant's systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

60.     Further, in the alternative, the Class may be maintained as a class action with respect to particular issues, pursuant to Fed.R.Civ.P. 23(c)(4).

## CAUSES OF ACTION

### COUNT I

### INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)
(brought on behalf of the Nationwide Class in conjunction with substantively similar consumer protection laws of other states and the District of Columbia to the extent New York law does not reach the claims of out-of-state Class members or, alternatively, on behalf of the New York Class)

61.     Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

62.     Plaintiff brings this claim on behalf of himself and the other members of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law ("NY GBL § 349").

63.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

64.     Under NY GBL § 349, it is not necessary to prove justifiable reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on General Business Law [§] 349 ... claims, it was error. Justifiable reliance by the plaintiff is not an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (N.Y. App. Div. 2012) (internal citations omitted)).

65.     Any person who has been injured by reason of any violation of the NY GBL may bring an action in their own name to enjoin such unlawful act or practice, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

66.     The practices employed by Defendant, whereby Defendant advertised, promoted, and marketed its Product as offering various health benefits were unfair, deceptive, and misleading and are in violation of the NY GBL § 349.

67.     The foregoing deceptive acts and practices were directed at customers.

68.     Defendant should be enjoined from marketing the Products with false health and negative ionization claims.

69.     Plaintiff, on behalf of himself and all others similarly situated, respectfully demands

a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees,

as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT II

### DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

(brought on behalf of the Nationwide Class in conjunction with substantively similar consumer protection laws of other states and the District of Columbia to the extent New York law does not reach the claims of out-of-state Class members or, alternatively, on behalf of the New York Class)

70.     Plaintiff realleges and incorporates herein by reference the allegations contained in

all preceding paragraphs, and further alleges as follows:

71.     Plaintiff brings this claim individually and on behalf of the other members of the

Class for violations of NY GBL § 349.

72.     Defendant's conduct and/or omissions as alleged herein constitute deceptive acts

or practices under NY GBL § 349, which was enacted to protect the consuming public from those

who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business,

trade or commerce.

73.     The practices of Defendant described throughout this Complaint, were specifically

directed to consumers and violate NY GBL § 349 for, *inter alia*, the following reasons:

> a. Defendant described the Products' promised health benefits as arising from negative ionization. Yet the Products cannot emit negative ions in sufficient quantity to have any impact on the surrounding environment or the persons in it;
>
> b. The Products do not benefit respiratory health;
>
> c. The Products do not offset the supposed negative effects of electromagnetic radiation;
>
> d. The Products do not remove dust, pollen, mold, fungus, and odors;

e. Defendant deceptively represented to consumers that the Products offer all the foregoing benefits;

74.     The practices employed by Defendant, whereby Defendant advertised, promoted, and marketed its Product as offering health benefits were unfair, deceptive, and misleading and are in violation of NY GBL § 349.

75.     Under the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

76.     Defendant's deceptive acts, omissions and practices were directed at consumers. Defendant's actions impact the public interest because Plaintiff and Class members were injured in exactly the same way as thousands of others purchasing the Product.

77.     By committing the acts alleged in this Complaint, Defendant has misled Plaintiff and the Class into purchasing the Products by inculcating false beliefs about the Products' health benefits.  This is a deceptive business practice that violates NY GBL § 349.

78.     Defendant's health claims misled Plaintiff and are likely in the future to mislead reasonable consumers. Had Plaintiff and Class members known the true facts about the Product, they would not have purchased it at the given price.

79.     The foregoing deceptive acts, omissions and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiff and other members of the Class to suffer damages in the form of, *inter alia*, monies spent to purchase the Product. Plaintiff and other members of the Class are entitled to recover such damages, together with statutory damages, equitable and declaratory relief, and appropriate damages, including punitive damages, attorneys' fees and costs.

## COUNT III

## DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
## (FALSE ADVERTISING LAW)

(brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection laws of other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)

80.     Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

81.     Plaintiff brings this claim individually, as well as on behalf of members of the Class, for violations of NY GBL § 350.

82.     Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

83.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

84.     Defendant caused to be made or disseminated throughout New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known to Defendant, to be untrue and misleading to consumers and the Class.

85.     Defendant's false and deceptive health claims as alleged herein were material and substantially uniform in content, presentation, and impact upon consumers at large.

86.     Defendant has violated N.Y. Gen. Bus. Law § 350 because its false and deceptive health claims were material and likely to deceive a reasonable consumer.

87.      Plaintiff and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising.

88.      Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff and Class members seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a (1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT IV

### BREACH OF EXPRESS WARRANTIES
(brought on behalf of the Nationwide Class in conjunction with the express warranty laws of the other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, alternatively, on behalf of the New York Class)

89.      Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

90.      Defendant provided Plaintiff and other Class members with written express warranties that the Product was (1) capable of cleaning the air, (2) capturing dust, pollen, mold, fungus and odors, (3) promoting respiratory health, and (4) counteracting the harmful effects of electromagnetic fields.

91.      These claims were an affirmation of fact. This affirmation of fact became part of the basis of the bargain and created an express warranty that the good would conform to the stated promise. Plaintiff and Class members placed importance on Defendant's claims.

92.      Defendant breached the terms of its express warranty to Plaintiff and the Class by not providing Products with the qualities promised.

93.      As a proximate result of Defendant's breach of warranties, Plaintiff and Class members suffered damages in an amount to be determined by the Court and/or jury, in that they purchased and paid for Products that did not conform to what Defendant promised in its promotion,

marketing and advertising. They were deprived of the benefit of their bargain and spent money on products that did not have any value nor had less value than was warranted.

## COUNT V

### COMMON LAW FRAUD

(Brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)

94.     Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

95.     Defendant intentionally made materially false and misleading claims through its health benefits representations, intending that Plaintiff and the Class rely on them.

96.     Plaintiff and Class members reasonably relied on Defendant's false and misleading representations and omissions. They did not know, and had no reason to know, the truth about the Products at the time they purchased them. They would not have purchased the Products had they known the truth—viz., that the Products are incapable of delivering any of their promised health benefits.

97.     Plaintiff and members of the Class have been injured as a result of Defendant's fraudulent conduct and must be compensated in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant, as follows:

a.  An Order that this action be maintained as a class action and appointing Plaintiff as representative of the Nationwide Class, with such subclasses as the Court deems appropriate, or, in the alternative, as representative of the New York Class;

b.  An Order appointing the undersigned attorney as class counsel in this action;

c.  Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d.  All recoverable compensatory and other damages sustained by Plaintiff and the Class;

e.  Actual and/or statutory damages for injuries suffered by Plaintiff and the Class in the maximum amount permitted by applicable law;

f.  An order (i) requiring Defendant to immediately cease its wrongful conduct as set forth in this Complaint; (ii) enjoining Defendant from continuing to misrepresent and conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; (iii) ordering Defendant to engage in a corrective advertising campaign; and (iv) requiring Defendant to reimburse Plaintiff and all Class members the amounts paid for the Product;

g.  Statutory pre-judgment and post-judgment interest on any amounts;

h.  Payment of reasonable attorneys' fees and costs; and

i.  Such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and all others similarly situated, demands a trial by jury on all questions of fact raised by the Complaint.

Dated: November 20, 2018

Respectfully submitted,

By: _____ */s/ C.K. Lee* _____
      C.K. Lee, Esq.

LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*